Brinkerhoee, J.
The plaintiff in error, John Clawson, at the June term, 1859, of the court of common pleas of Hamilton county, was indicted jointly with William Adams, Charles Clawson and William Clawson, for the crime of murder in the first degree, in killing, by shooting with a pistol, one Richard T. Mahone. On this indictment he was tried at the January term, 1860, convicted of murder in the second degree, and in March following he was sentenced to imprisonment in the *235 penitentiary for life. Previous to the trial a motion was made to quash the indictment; and after verdict, motions were made for a new trial, and in arrest of judgment; all which motions were overruled. A bill of exceptions was taken, embodying all the evidence in the case, and the same was made part of the record.
The principal question made in the argument of the case in behalf of the plaintiff in error is, upon the sufficiency of the indictment. But, on the authority of the sixth proposition-resolved in the case of Loefner v. The State, 10 Ohio St. Rep. 599, we find the indictment to be clearly sufficient; and in the-other points made in the argument we find nothing worthy of particular notice.
There is, however, a question fairly presented by the record, in the decision of which we are of opinion that the court of common pleas erred, to the detriment of the substantial--rights of the prisoner, the plaintiff in error, by reason of which-the judgment and sentence against him must be reversed.
An outline of the case made by the evidence as set forth in-the bill of exceptions, is substantially this: The prisoner and the deceased, Mahone, were both young, and both married men, residing in Cincinnati. Mahone, for some cause undisclosed in the record, was sepaiated from his family. The wife-of the prisoner was an attractive, but artful and utterly unprincipled young woman; while he was a fond and indulgent,, but a too confiding husband. A few weeks prior to the killing of Mahone, she secretly, left her husband, and, under another name than her own, took lodgings across the river, in-Kentucky; and there, for some two weeks, Mahone nightly» lodged with her under the assumed character of her husband.
Previous to this elopement, the prisoner, had abundant reason to more than suspect the fidelity of his wife,,and he had carried his charity of judgment to an extreme limit; but he-manifested for her a sincere attachment, and a desire — to use his own words — “ to save her from utter ruin.” He had however, commenced proceedings against her for a divorce; and, during the day preceding the night on which Mahone was-killed, he was engaged, in company with a friend, in searching *236 for evidence of the guilty connection of his wife with Mahone as before mentioned; and in this search he seems to have been •entirely successful. He returned from over the river early in the evening, and was seen to drink heavily. Mahone boarded at a taverh, called the Telegraph House, and situated on a street corner. And, during the evening it seems to have been •agreed upon betwéen the prisoner, his two brothers, Charles ■and William Clawson, and one Adams, that they would repair to the Telegraph House or near it; that Adams should take ■measures to get Mahone out of it into the street, and that the prisoner and his brothers, or some of them, should then inflict violence upon him; but what degree of violence was intended •does not appear, except so far as it may be inferred from what -afterward occurred.
Accordingly, about eleven o’clock at night, Adams, who was then much intoxicated, entered the bar-room of the Tele.graph House where Mahone then was, began to pick a quarrel with Mahone, and challenged him to go out on the street and fight him. After some parleying, they went out into the ■street; and almost immediately afterward Adams called out, ■“ come on, John! ” — or, “ come on, boys! ” — and then the prisoner, with his two brothers before named, advanced from •around the corner of the street to within a few feet of Mahone, and the prisoner at once, without speaking, shot and killed him with a pistol.
Such being an outline of the facts of the case, and the prisoner being on his separate trial, the prosecution, claiming that William Clawson was a conspirator with the accused in the commission of the crime charged, sought to make his declarations available as evidence against the prisoner. And hence in the bill of exceptions we find the following — William Hackwelder being on the stand as a witness: “ The witness then proceeded to state what William Clawson had stated to him in the early part of the evening, in the absence of the defendant, John Clawson, to which the defendant, by his attorneys, objected; but the court overruled the objection; to which the defendant excepted; and thereupon the witness proceeded -to state — that William Clawson stated to him, in the absence *237 of John Clawson, that he, William Clawson, was sitting on his door steps when John Clawson came out and took his cap and put it on his, John’s head, and put his, John’s, hat on William’s head. William said to me, if that cap gets into the watch-house that night he would never wear it again.”
Whether these declarations of William Clawson were offered, and admitted as evidence of the body of the crime charged against the prisoner, or merely as preliminary evidence of a conspiracy between William and the prisoner to commit the-crime, and thus to lay the foundation for the admission of other declarations by William as evidence against the prisoner,, does not appear from the record. We are therefore compelled to consider whether they were admissible for either purpose;, for, if admissible for either, there was no error.
As evidence of the body of the crime, against any other' party than him by whom they were made, these declarations are clearly inadmissible. A conspiracy to commit a crime having been proved prima facie, to the satisfaction of the-court, or by evidence sufficient to be properly taken into consideration by the jury, the declarations of one conspirator are evidence against another, not when they are mere confessions,, or narrations of past occurrences, and the declarations themselves have no tendency to promote the consummation of the common criminal intent; but they are admissible only when the declarations themselves are in the nature of verbal acts,. and are in themselves, as distinguished from the acts which they disclose or reveal, an instrumentality in furtherance and. promotion of the common criminal design. To illustrate the distinction : suppose that A. and B. have conspired to murder C.; and the plan of the conspirators is, that C. shall be pursuaded to accompany B. on a hunting excursion, during which B. shall shoot C.; and then pretend that the latter shot himself by accident. Now, if C. is killed, and A. is heard to say,. “I advised C. to accompany B. on that excursion, and told him I myself had lately found abundance of game and sport in the region intended to be visited,” this declaration would be inadmissible against any one but him who made it; because-the declaration itself had no tendency to further the common- *238 •criminal purpose. It would be a mere confession; a narrative of a past occurrence ; hearsay. But if, the fact of conspiracy being sufficiently proved, a witness come forward and testify that he heard A. say to C., “you will do well to join B. in his intended hunting excursion, for I have recently found abundance of game,” etc., then the declarations are admissible ,against B., because the declarations themselves tended to fhrther and promote the common criminal design of the conspirators. And this distinction is clearly defined and firmly established in the cases, Fouts v. The State, 7 Ohio St. Rep. 471; Roscoe’s Crim. Ev. 84, and cases there cited. Now, in view of this distinction, the declarations of William Clawson given in evidence in this case, were a mere narrative of what had occurred between him and the prisoner ; the declarations made by William had no tendency to further, or promote, or forward the common criminal intent, if such intent existed; nor were they made while in the attempted execution of a common criminal intent, so as to become a part of the res gestee; they were hearsay only, and inadmissible to prove the body of the crime as against the prisoner.
The question still rema-ins, whether the declarations of William Clawson, though inadmissible against the prisoner as evidence of the corpus delicti, are not, nevertheless, admissible as evidence of the existence of a conspiracy to commit the crime charged, and thus to lay the foundation for the admission in evidence against the prisoner, of other declarations by con■spirators.
On this question there is a dearth of cases. The elementary books refer to but one — Hardy’s case, 24 Howell’s St. Tr. 453; and I have been able to find no other. In that case two -of the five judges seemed to have been of opinion, that the mere declarations of a person who admitted himself to be a party to a conspiracy might be admitted in evidence against another party to prove the existence and nature of the conspiracy ; but the majority of the court held such declarations to be inadmissible for this purpose, unless they were in themselves acts, or were accompanied by acts, in furtherance of •the common criminal object. And all the leading elementary *239 writers on the law of evidence are decided in the expression of their opinions that evidence of such declarations is inadmissible, except as against the party by whom they are made. 2 Starkie’s Ev. 406-7; Roscoe’s Cr. Ev. 617; 2 Russ, on Or. 697.
The existence of a conspiracy being first established, “ the principle on which the acts and declarations of other conspirators, and acts done at different times, are admitted in evi■dence against the persons prosecuted, is, that by the act of •conspiring together, the conspirators have jointly assumed to themselves, as a body, the attribute of individuality, so far as regards the prosecution of the common design; thus rendering whatever is done or said by any one, in furtherance of that ■design, a part of the res gestee, and therefore the act of all. It is the same principle of identity with each other that governs in regard to the acts and admissions of agents when .offered in evidence against their principals, and of partners against the partnership.” 3 Greenl. Ev. sec. 94. But the reasons on which this principle rests are wholly wanting, and the principle can have no application to a case where the ■mere declarations of a stranger, not in furtherance of any ■design common to himself and the prisoner, are offered in evidence to prove the fact of conspiracy. And unsanctioned as such declarations always are by the great tests of truth, to-wit: the obligations of an oath, the process of cross-examination, and the restraint arising from the personal presence of the accused, we are of opinion that their admission is unwarranted by any sound principle, and would be dangerous in practice.
Judgment reversed, new trial awarded and cause remanded.
Peck, C.J., and Scott, Ranney and Wilder, JJ., concurred.